Monroe College of Optometry, Appellant, v.
Harry Goodman et al., Appellees.

Gen. No. 43,861.

80

Opinion filed June 26, 1947. Released for publication July 8, 1947.

GRENVILLE BEARDSLEY and BEN COPPLE, both of Chicago, for appellant.

ROSEN, FRANCIS & CLEVELAND, JOSEPH S. SULLIVAN, MAYER, ALTHEIMER & KABAKER, and GERALD T. WILEY, all of Chicago, for separate appellees.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Plaintiff appeals from a judgment order sustaining defendants' motion to strike plaintiff's fifth amended complaint. Plaintiff elected to stand by the complaint and an order was entered dismissing the suit at plaintiff's costs.

Plaintiff's fifth amended complaint reads as follows:

"1.  Plaintiff is a corporation organized under the laws of the State of Illinois, and since the year 1937, has continuously conducted a school for the teaching of optometry. It has a faculty consisting of persons skilled in the science and teaching of optometry; that by reason of its competent faculty and instructors and the efficient and competent conduct of classes, plaintiff has built a good reputation as a school for the teaching of optometry. The subjects taught at said school fully educate attending students to practice the science and profession of optometry in the various states of the United States.

"2.  Its student body is made up of persons from various states of the United States and plaintiff enjoys the benefits of tuition fees and emoluments derived from its students.

"3.  Plaintiff, in the conduct of its school uses and employs standard, adequate and suitable equipment

and paraphernalia wherewith students attending the school are taught the science of optometry. By reason of the education and training thereat received, students of plaintiff's school upon graduation, are thoroughly qualified as competent to practice said profession and are able to efficiently and in accordance with the requirements of the statutes and regulations of the various states of the United States, perform the duties and render the services required from optometrists.

"4. The school of the plaintiff is and has been approved as a school for the teaching of optometry by the Department of Registration and Education of the State of Illinois. Said approval by said state was given after an examination of the school by the Illinois Board of Examiners and in conformity with the laws of the State of Illinois thereunto appertaining. Likewise, said school has been approved by the United States Army and Naval authorities as qualified to efficiently teach optometry, and its graduate students have been accepted as competent for rendering the services required of optometrists by the aforesaid public agencies.

"5. An organization was formed (which has existed throughout all the time and periods herein complained of) known as International Association of Boards of Examiners in Optometry (said organization may hereafter be referred to as 'Association)'.

"6. Some of the states of the United States having Boards of Examiners who authorize and license persons to practice optometry in such states have adopted regulations requiring that only persons graduating from schools of optometry that are approved by the 'Association' will be licensed or qualified to practice such profession in such states. Among the states having such regulations are the following: Louisiana Indiana New Jersey Texas Minnesota Pennsylvania North Dakota West Virginia Montana Michigan Ohio.

"7. The plaintiff sought and obtained approval and recognition from the 'Association' on July 15, 1941, as a school suitable and competent to fully instruct students in the science of optometry. Said approval and recognition from the 'Association' was obtained pursuant to investigations and examinations of plaintiff's school by the Educational Committee of said 'Association' who then had in their charge and under their jurisdiction the investigation of schools and faculties of schools for the purpose of determining their suitability and fitness for recognition as suitable schools for the teaching of optometry.

"8. William B. Needles, one of the defendants, is President of the Northern Illinois College of Optometry, located in Chicago, Illinois. Said school is the only other school of optometry in the City of Chicago or in the middle western section of the United States. It competes with plaintiff's school for students who seek to be taught the science of optometry and pay tuition for such instruction. The other defendants are optometrists or persons interested in the operation of schools of optometry.

"9. By reason of its superior location and facilities, its able and outstanding faculty, its broad curricula and superior methods of instruction, and its progressive and forward looking administration, plaintiff drew to itself an ever increasing enrollment, and its student body equalled and then increasingly surpassed that of Northern Illinois College of Optometry, which entered into a period of decline.

"10. Early in December, 1941, the defendant, William B. Needles, communicated orally with plaintiff's president, and suggested the merger of plaintiff with said Northern Illinois College of Optometry, upon terms and conditions which would have resulted in the receipt of a large sum of money, to wit, $40,000, by plaintiff's president. Such offer was rejected.

"11.   Thereupon, on, to wit, 29 December, 1941, and continuously thereafter, throughout a long period of time, to wit, until the present time, contriving and intending to destroy plaintiff, and to thus unlawfully eliminate all competition in the field of optometric education with the Northern Illinois College of Optometry in the states of the union between the Allegheny Mountains and the Rocky Mountains, said William B. Needles, said Harry Goodman, said Lewis Kraskin, said W. I. Brown, said R. I. Brown, said A. L. Brown, said John Corbett, said John I. Davy, said Albert Fitch, said Ewing Adams, said George Parkins, said W. C. Ezell, said R. Hall, said Fred C. Emerson, said J. F. Neill, said B. T. Hoffman, said Walter F. Kimball, at Chicago, in the County and State aforesaid, did unlawfully and wickedly and maliciously combine, conspire, confederate and agree together and with other persons, whose names and whose identities are unknown to the plaintiff, with the fraudulent unlawful and malicious intent to compose and publish wicked, malicious, false and untrue libelous statements and oral defamations and by these unlawful means and thereby in an unlawful manner to accomplish the following:

"(a)   To damage, injure and destroy the good name and reputation of plaintiff's school, of the individual members of its faculty and of the individual officers of said plaintiff's school and to thereby discredit the school so that students would not enroll in said school to obtain instruction in the science of optometry, and that enrolled students would discontinue attendance thereat;

"(b)   To dissuade and discourage prospective students of plaintiff's school or those who intended to enroll in plaintiff's school to enroll therein;

"(c)   Encourage persons desiring to learn the science of optometry to attend a competing school of

the plaintiff, namely, the Northern Illinois College of Optometry and not to attend plaintiff's school;

"(d)  To encourage students already in attendance at plaintiff's school to discontinue their attendance thereat and enroll in the Northern Illinois College of Optometry;

"(e)  To extort money from plaintiff.

"12. In pursuance of said unlawful conspiracy and in furtherance of the unlawful objects thereof, said conspirators did cause and procure to be committed the following overt acts at the times and places hereinafter alleged:

"(a)  On or about 22 November, 1941, said J. F. Neill wickedly and maliciously composed and published at Chicago and elsewhere, a libelous and defamatory mimeographed letter or circular of and concerning plaintiff as follows:

" 'In 1939, the Monroe College made application to the Pennsylvania Board for recognition. As is customary the Pennsylvania Department was directed to make an investigation. The report showed Monroe College to be so lacking in everything constituting a school that it is preposterous to think that at this time it could have been improved to meet the qualifications for recognition. From every standpoint the institution was sub-standard; education concepts, faculty, the physical facilities for teaching financially and in every other way.'

which statement was false and untrue.

"(b)  On November 29, 1941, said William B. Needles and said B. T. Hoffman wickedly and maliciously at Chicago and elsewhere did compose and publish a wicked and malicious libel of and concerning plaintiff in the following printed words:

" 'The student body is almost all of the Jewish faith. Just trying to squeeze through, make the State Board

and then sell the service of their license to any department store or other similar institution which at no time is a credit to optometry. I greatly doubt whether the preliminary education demanded is strictly adhered to. Also greatly doubt that the hours required in the curriculum are strictly adhered to. In other words, it is a very slip-shod method of teaching students. I do not believe any improvement has been made in the last two years. Maybe the financial status is such that they cannot afford to do better. I do not think the I. B. B. (meaning 'Association') would have given the school recognition unless definite promises for improvement have been made. I cannot see how in the world they can uphold such recognition under present conditions.'

which statement was false and untrue.

"(c) On December 26, 1941, said William B. Needles induced and secured one Fred C. Emerson and one Sidney B. Katz to compose and publish at Chicago and elsewhere a wicked and malicious libel of and concerning plaintiff, in the form of a mimeographed circular which was widely distributed, stating as to plaintiff that:

" 'The class and Lab rooms are not class rooms and laboratories; they are simply rooms. The clinical equipment is poor and inferior.'

" 'The school has a hospital affiliation with a hospital which is not recognized and an ethical M. D. cannot practice in that hospital.'

" 'Standards on which they accept new students or transfers are very low. Any student is welcome, regardless of record.'

" 'The school caters to pawn shop and jewelry establishments trying to draw men from there, and not finishing, those men will go back and practice in those places of business.'

which statements were false and untrue.

"(d) On December 18, 1941, the defendant, Harry Goodman, composed and published a wicked and malicious libel of and concerning the director of plaintiff, Dr. Seid, and the hospital wherein the clinical work of plaintiff was conducted, with the intent and for the purpose, that by the circulation thereof the standing of the plaintiff's school might be injuriously affected; that its then students might be induced to transfer to Northern Illinois College of Optometry and that prospective students might thereby be induced to enroll in the latter school rather than in plaintiff school, which said libel was mimeographed and widely circulated, and was in the words and figures following:

" 'He (Dr. Cutter, officer of the American Medical Association) did not hestitate to say that both the hospital, as well as Dr. Seid, were all of questionable reputation.'

" 'Now, my personal opinion, is that Seid is a very questionable character, both as to reputation and integrity, nor did I hear one word of commendation for the hospital he is reported to own. Much has taken place since you were there and the misstatement which he made to me brings me to but one conclusion, and that is that we should remove his rating as soon as possible. This is confidential to you, to be handled as you see fit. If you wish to make further investigation, it would seem to me that it should wait until your return trip after we have had a conference. I am enclosing a sufficient number of copies of correspondence for distribution to the committee if you desire. I have tried my best not to burden you. I cannot help but feel the sooner we get this thing settled the better.'

"(e) On February 6, 1942, the defendant, Charles Scheer, wrote and published of plaintiff that:

" 'It will take you no longer to. go through the very finest school of optometry than through the poorest.'

"(f) On several dates in 1942, the defendant, Lewis Kraskin, demanded a large sum of money, to wit, $5,000, from the director of plaintiff, and stated that upon the payment of such money to him, he would cause and procure the other defendants herein named to cease and desist from circulating letters denouncing plaintiff and praising Northern Illinois College of Optometry.

"(g) In 1942 the defendant, Robert I. Brown, composed and published a wicked and malicious libel of and concerning plaintiff which was widely distributed as a circular letter to the effect that the school was unsuitably located, although said school, as the defendants well knew, was located on Wacker Drive in the downtown section of the City of Chicago and was, therefore, easily accessible to students and faculty and when the school was, as the defendants well knew, in the immediate vicinity of other schools of learning, which statements were false.

"(h) In 1942 each of the said defendants on numerous occasions did orally slander and defame plaintiff by falsely stating to numerous persons interested in the science of optometry that the school had neither adequate, competent nor efficient faculty, nor adequate and proper equipment and paraphernalia wherewith to teach students the science of optometry. Such statements were false and were made by defendants although none of said defendants had made any examination of said school, other than an examination made by the defendant, Lewis Kraskin, in the year 1939, long prior to the time when said school obtained recognition and approval from the 'Association'. The defendants well knew at the time of making such false and fraudulent statements, that an examination had been made of said school by the 'Association'; that the result of said examination was on record in the files of the 'Association' that the 'Association' had found said school and its faculty competent and suit-

able to teach the science of optometry, and had further found that said school was adequately equipped as to faculty, paraphernalia and all necessary equipment.

" (i) The defendants, in 1941 and 1942, in further pursuance of said conspiracy, at various times and dates, told persons who were intending to enroll as students in plaintiff's school, and also told students in attendance at plaintiff's school that said school was unsuitable as a place for the teaching of optometry. That members of its faculty and officers were of questionable integrity and character. Said students in attendance were told to discontinue from attendance at plaintiff's school and to attend the classes of the Northern Illinois College of Optometry, of which school the defendant, William B. Needles, is the President. Said students who were attending at plaintiff's school and where defendants sought to discontinue their attendance thereat, were further told that said Northern Illinois College of Optometry would give them credit for the attendance at plaintiff's school and that they would be benefited by changing schools in that by such change to the Northern Illinois College of Optometry, such students would be entitled to take examination in any of the states of the United States, whereas they would be unable to take examinations in any of the states of the United States except Illinois, if they did not transfer from plaintiff's school.

" (j) The defendants met on the 29th day of December, 1941 to further their methods and devise additional schemes for injuring the plaintiff in its good name and reputation and to devise means to induce the 'Association' to withdraw its recognition and approval of the plaintiff's school as a school suitable for the teaching of optometry.

" (k) 'Visual Digest' and 'American Journal of Optometry' are publications regularly published in the United States dealing with optometry and related subjects. Accredited schools for the teaching of op-

tometry were and are permitted to advertise in said publications. Members of the faculties of schools for the teaching of optometry write articles from time to time which are published in said publications. The name, fame and good reputation of institutions teaching optometry and of their faculties thereby receive favorable recognition and become known generally to persons interested in said science. The defendants, William B. Needles and Walter F. Kimball on April 17, 1942, well knowing such facts, in furtherance of said conspiracy did maliciously, unwarrantedly and improperly induce the publishers of said publications to refrain from accepting advertising matter from the plaintiff and to refrain from accepting any articles or correspondence from members of its faculty, and did induce the 'Visual Digest' to refrain from publishing in a pretended list of approved schools of optometry, the name of plaintiff's school as an approved school, although at the time it was so requested by plaintiff, plaintiff's school had been and was approved by the 'Association' as hereinabove stated.

"(1) On June 23, 1942 at Dallas, Texas, the defendants, Needles, Goodman and Kraskin attended a convention of the 'Association' held at Dallas, Texas, and thereat concealed a report of an investigation made by the Chairman of the Educational Committee of the 'Association' dealing with the suitability of plaintiff's school, stating that same had not been received, that school was unsuitable as a school of learning of the science of optometry, which statements were false and known by them to be false.

"13. By means and in consequence of the said wrongful and illegal combination and of the said wrongful acts in furtherance of the wrongful object thereof, (a) the plaintiff was greatly damaged in its good name, reputation and standing, (b) a substantial number of students, to wit 10, were caused and induced thereby to withdraw from plaintiff college and to enroll

in Northern Illinois College of Optometry, (c) a large number of prospective students, to wit 50, who contemplated enrollment in plaintiff school were thereby caused and induced to refrain from enrolling and pursuing the course of study in plaintiff school and to enroll and pursue the course of study in Northern Illinois College of Optometry, (d) plaintiff has otherwise thereby and in consequence thereof been caused to suffer, now suffers and will continue to suffer in future great damage to its reputation and scholastic standing; all to the damage of the plaintiff in the sum of $100,000; Wherefore it brings this suit, etc.''

Plaintiff strenuously contends that the action of the trial court in holding that the fifth amended complaint failed to state a cause of action is indefensible and amounts to a gross miscarriage of justice, the effect of which was to deny plaintiff its day in court. After a careful consideration of the fifth amended complaint, hereinafter referred to as the complaint, we are satisfied that the contention of plaintiff is a meritorious one. Indeed, we are unable to understand upon what theory the trial court based his ruling that the complaint failed to make out a *prima facie* case against defendants. The complaint, even if tested by the ancient technical rules of common law pleadings, would not, in our judgment, be vulnerable to a motion to strike, but the question before us is to be determined in the light of the provisions of the Civil Practice Act. In *People ex rel. Wilmette State Bank v. Village of Wilmette,* 294 Ill. App. 362, MR. JUSTICE O'CONNOR said (p. 368):

''The purpose of the entire act [Civil Practice Act] was to simplify the procedure and the prime object of the act was to enable the parties to a cause to have the merits of their controversies passed upon by the courts—the realities considered rather than that the matter be decided on mere technicalities which often justly bring the courts into disrepute.''

In *Pape v. Pareti,* 315 Ill. App. 1, 9, this Division of the court stated: " '. . . A great lawyer and statesman, the late ELIHU ROOT, said: "Justice is entangled in a net of form." Obviously this ought not to be. The purpose of a law suit is to ascertain the facts of the matter in controversy so that the merits may be passed upon by the court—"the realities considered rather than that the matter be decided on mere technicalities." *People ex rel. Wilmette State Bank v. Village of Wilmette,* 294 Ill. App. 362. . . .' "

Paragraph (3), Section 33, of the Civil Practice Act [Jones Ill. Stats. Ann. 104.033] provides: "Pleadings shall be liberally construed with a view to doing substantial justice between the parties." Paragraph (2), Section 42, of the Act [Jones Ill. Stats. Ann. 104.042] provides: "No pleading shall be deemed bad in substance which shall contain such information as shall reasonably inform the opposite party of the nature of the claim or defense which he is called upon to meet."

In *Carlson v. Carpenter Contractors' Ass'n,* 305 Ill. 331, the court said (p. 338): "The law seeks to protect every person against the wrongful acts of others, whether committed alone or by combination, and an action may be had for injuries done which cause another loss in the enjoyment of any right of privilege or property. No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation or for the sake of compelling him to do some act which in his own judgment his own interest does not require. Losses willfully caused by another from motives of malice to one who seeks to exercise and enjoy the fruits and advantages of his own enterprise, industry, skill or credit will sustain an action. (*Doremus v. Hennessy,* 176 Ill. 608; *London Guarantee Co. v. Horn,* 206 id. 493; *O'Brien v. People,* 216 id. 354; *Purington v. Hinchliff,* 219 id. 159; *Gibson v.*

*Fidelity and Casualty Co.,* 232 id. 49; *Wilson v. Hey,* 232 id. 389.)''

▮▮ In *Doremus v. Hennessy,* 176 Ill. 608, the court states (p. 615):

''Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will, and anyone who invades that right without lawful cause or justification commits a legal wrong, and, if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong. Damage inflicted by fraud or misrepresentation, or by the use of intimidation, obstruction or molestation, with malicious motives, is without excuse, and actionable.'' (See, also, *Purington v. Hinchliff,* 219 Ill. 159, 166.)

▮ Stated briefly, the complaint charges in plain and apt language that defendants conspired to injure the business of plaintiff through false, libelous and slanderous statements, and alleges that numerous overt acts were committed by defendants in furtherance of the conspiracy. It further alleges that the object was to unlawfully eliminate plaintiff as a competitor of the Northern Illinois College of Optometry in certain States of the union in the field of optometric education. The complaint states fully the object of the conspiracy and the injuries that plaintiff suffered as a result of it. By way of inducement the complaint alleges, in substance, that the conspiracy was formed and carried on because plaintiff refused to merge with the Northern Illinois College of Optometry. Even a layman reading the complaint would understand fully the nature of plaintiff's claim which defendants were called upon to meet, and where such information is contained in a pleading it shall not be deemed bad in substance provided the complaint makes out a *prima facie* case against the defendant.

██ ██ If upon a trial plaintiff produces proof sufficient to sustain the material allegations of the complaint defendants will be called upon to defend a very serious case. The counsel for defendants, in an effort to sustain the judgment in the instant case, urge a number of technical criticisms of the complaint. We are satisfied that none of them has substantial merit. We will briefly refer to certain of the criticisms: Defendants contend, as we understand their argument, that mere charges of conspiracy are mere conclusions of law, and that unless the facts constituting the conspiracy are stated a cause of action for conspiracy is not alleged. To support their claim that sufficient facts constituting the conspiracy are not alleged in the complaint, *Tribune Co. v. Thompson,* 342 Ill. 503, 530, is cited. In that case the Supreme court, in its opinion, was discussing the question of the *proof* that was required of plaintiff in that action. The court was not passing upon the sufficiency of the pleadings. It is undoubtedly true that if the complaint merely charged that defendants conspired and agreed together to injure plaintiff it would be vulnerable to a motion to strike, but the complaint states many overt acts committed by defendants in furtherance of the conspiracy. The allegation in the complaint that the overt acts were committed in pursuance of the conspiracy was proper and necessary, and, as so used, is not a mere conclusion of the pleader. Had plaintiff failed to make such an allegation defendant would have undoubtedly contended that such failure made the complaint vulnerable to attack. Defendants contend that the complaint charges that the conspiracy began December 29, 1941, and that it further charges, in effect, that two overt acts were committed before that date, and defendants seem to argue that under such a state of the pleading the complaint is vulnerable to the motion to strike. The complaint charges that after plaintiff had rejected

the offer to merge with the Northern Illinois College of Optometry, "Thereupon, on, *to wit,* 29 December, 1941, and continuously thereafter, throughout a long period of time, to wit, until the present time, contriving and intending to destroy plaintiff, and to thus unlawfully eliminate all competition . . ." said defendants conspired and agreed together, etc. Defendants contend that for the purpose of testing the merits of the motion to strike December 29, 1941, must be taken as the date of the formation of the conspiracy even though that date is laid under a *videlicet,* and they cite in support of this contention *Bishop v. Dignan,* 223 Ill. App. 178. MR. JUSTICE O'CONNOR, who wrote the opinion in that case, recognized the general rule that where a date is alleged under a *videlicet* it is not necessary upon the trial to prove the date alleged. In the *Bishop* case it was necessary for the plaintiff to allege and prove that the suit was brought within one year after the death of the deceased. The suit was brought on May 28, 1915, and the declaration alleged that deceased was killed "on to wit: the 24th day of June, A. D. 1914." It was held that the proof upon the trial need not show that the deceased was killed on June 24, 1914. The defendant in that case contended that the declaration did not state a cause of action because it was a statutory action in which the specific date of the death must be averred and that this was not done since the date was laid under a *videlicet.* In response to this contention the court held (p. 181) that "in testing the sufficiency of the declaration, the time stated, June 24, 1914, although laid under a *videlicet,* must be taken as the true date." The court held that the contention of the defendant that the declaration did not state a cause of action was without merit. The instant case was not a statutory action. Moreover, the two overt acts referred to by defendants could be, although they need not be, ignored and there would still remain in the

complaint a number of overt acts that the complaint shows clearly were committed after December 29, 1941. It would be a poor pleader who would allege positively that the conspiracy charged·commenced on a certain date.

Defendants contend, apparently, that the facts alleged are insufficient to charge defendants with conspiracy and they argue that plaintiff was obliged to set forth clearly the ultimate facts upon which it relied as showing the existence of a conspiracy; that "if plaintiff was in a position to offer evidence to substantiate a charge of conspiracy, it would have been a simple matter so to allege. For example, if all of the defendants met at a given time and place and agreed to engage in certain acts in pursuance of a common design, such facts could be readily and simply stated. Or if all of the defendants, by an exchange of correspondence, agreed to combine and to conspire against the plaintiff, the existence of such correspondence and their import or appropriate recitations of the exact language therein contained, could likewise be aptly and easily stated in the complaint. In that event the defendants would have been informed of the matters they would be called upon to defend." This contention amounts to a claim that plaintiff was obliged to allege the evidentiary facts relating to the conspiracy, and defendants admit that plaintiff was not obliged to allege in its complaint "evidentiary facts." We may add that if the instant contention of defendants related to the nature of the proof that plaintiff would be compelled to offer in support of its case, the following rules of law would govern the contention: "A mere tacit understanding between conspirators to work to a common purpose is all that is essential to a guilty, actionable combination. Individual intent by two or more persons to do an unlawful act or a lawful act by unlawful means is the first step in that regard. Next follows concurrence between

such individuals,—not concurrence of action merely, (*United States v. Barrett,* (C. C.) 65 Fed. Rep. 62,) but concurrence in mental intent to effect the common purpose, each to aid the others in that regard. Mutuality in the undertaking may be secured without any express agreement, and without a spoken or written word between the conspirators or a meeting of the members of the combine, or their even all knowing each other, or the precise thing to be accomplished or plans for its accomplishment, either in a general way or in detail, being distinctly stated by any member of the combine to any other member. If there is a meeting of minds, brought about in any way, to accomplish the common purpose, the essentials of a guilty combination are all satisfied.'' (*C., W. & V. Coal Co. v. People,* 214 Ill. 421, 453, 454.)

Defendants contend, as we understand the contention, that the fifth amended complaint amounts to nothing more than a refiling of the third amended complaint which was stricken, and that plaintiff by not standing by the third amended complaint confessed that the order striking it was a meritorious one, and that as plaintiff did not materially change the allegations of the third amended complaint in its fifth amended complaint, ''it did not in truth file an amended complaint,'' and its said confession should be held as a confession that the order striking the fifth amended complaint was justified. In support of this strained argument defendants cite *Life Printing & Pub. Co. v. Marshall Field III,* 324 Ill. App. 254, but we are unable to see how that case supports the contention that plaintiff confessed, in effect, that the fifth amended complaint did not state a cause of action. Moreover, there is no merit in the contention that the fifth amended complaint is but a mere restatement of the third amended complaint.

Several other strained and technical arguments are made by defendants in support of the instant judgment

but none, in our judgment, has real substance and merit.

As we view this record justice demands that the instant cause be speedily tried upon the merits.

The judgment of the Circuit court of Cook county is reversed and the cause is remanded with directions to the trial court to enter a rule upon defendants to answer plaintiff's fifth amended complaint.

*Judgment reversed and cause remanded with directions.*

FRIEND, P. J., and SULLIVAN, J., concur.