Meyer Field, Plaintiff-Appellant, v. Nugent R. Oberwortmann, Frank J. Tierk, Clarence D. Oberwortmann and Andrew B. Barber, Defendants-Appellees.

Gen. No. 47,006.

First District, Second Division.
June 28, 1957.
Rehearing denied September 20, 1957.
Released for publication September 20, 1957.

Abraham W. Brussel, of Chicago, for plaintiff-appellant.

Kirkland, Fleming, Green, Martin & Ellis (Carl S. Lloyd, and Frank L. Winter, of counsel) for defendants-appellees.

PRESIDING JUSTICE KILEY delivered the opinion of the court.

This is an action to rescind a sale of bank stock. The suit was dismissed for want of equity on defendants' motion to strike the amended complaint. Plaintiff elected to stand by his pleading and has appealed.

Defendants' motion to strike admits the facts well pleaded, and although the amended complaint is construed most strongly against plaintiff, he is entitled to the reasonable intendments of the language used in the amended complaint. (Chapman v. Northern Trust Co., 13 Ill.App.2d 386.) A plaintiff is entitled to favorable inferences after decree (Lasko v. Meier, 394 Ill.

71), but not before. The court in Wedell v. American Telephone & Telegraph Co., 8 Ill.App.2d 510, 513, made a contrary statement, but the court there seems to have mistaken a demurrer to a pleading for a demurrer to the evidence and the case cited to the statement does not support it. A pleader who sets forth facts need not set forth the legal effect of or conclusion from the facts. (Leitch v. Sanitary Dist. of Chicago, 369 Ill. 469, 473.) A plaintiff need not allege with precision facts which "to a much greater degree of exactitude" are within the knowledge of defendants rather than of plaintiff. (Opal v. Material Service Corp., 9 Ill.App.2d 433, 441.) Under these rules we shall consider whether the amended complaint states a cause of action.

In June, 1941, plaintiff and one Carl Kuehnle acquired majority ownership of two classes of stock issued by the North Shore National Bank of Chicago. A third class of stock, representing a majority of the voting shares of the bank, was owned entirely by the Reconstruction Finance Corporation. Plaintiff and Kuehnle therefore controlled only a minority of the directorate of the bank.

At that time, the bank was located in a building leased from a corporation controlled by the "majority group" on the Board of Directors. Plaintiff deemed the rent excessive, and negotiations were undertaken to reduce the rent. Consideration was given also to a proposal to move the bank to a new location where the rental would be less than half that being paid at the existing location. Plaintiff and Kuehnle went to the Chicago Manager of the RFC, one Frank Murchison, to seek advice on the matter. Murchison referred them to defendant Oberwortmann, who at that time was Chief National Bank Examiner for the Seventh Federal Reserve District with jurisdiction over the bank.

Oberwortmann refused to approve the relocation of the bank despite the saving in rent and the fact that

no expense would be incurred in moving. Instead he demanded that the bank raise $250,000 additional capital and stated to "plaintiff and others" several times that liquidation of the bank might be "necessary" and "a good idea." Oberwortmann also dissuaded an acceptable and agreeable candidate for the bank presidency from taking the position by repeating the demand for additional capital and the statement about liquidation. At this same time, a bank examiner working under Oberwortmann insisted on "writing off" $6,000 in recently defaulted mortgage bonds which plaintiff then evaluated at 75 cents on the dollar and which within a year were redeemed at full value plus interest.

During this time Kuehnle was president of another, larger bank in Chicago. The larger bank was his primary interest and Kuehnle feared that any dispute with Oberwortmann at the North Shore Bank would jeopardize this interest. Murchison was waiting for an opportunity to purchase Kuehnle's North Shore Bank stock and was being advised by Oberwortmann to persist in offers of purchase. At the same time, Oberwortmann was coercing Kuehnle's superiors at the other bank to induce Kuehnle to sell his North Shore Bank stock in order to relieve the other bank from official pressure.

Though he had originally intended to sell to plaintiff, Kuehnle in the fall of 1943 sold his stock to Murchison. The effect of this sale was to divide the combined minority strength of plaintiff and Kuehnle and "relegate" plaintiff to an "isolated" minority status. In December of 1943 plaintiff, under the official pressure of Oberwortmann and Murchison, sold 90 per cent of his own stock to the latter. He did not know then, although Murchison and Oberwortmann had knowledge, that improved earnings of the bank had increased the value of the stock. A month after his sale, having

learned the facts, plaintiff sought rescission and repurchase at a price which would have netted Murchison a profit of $75,000. He and Murchison discussed rescission during many years after the sale and Murchison made plaintiff many promises to resell.

With the sales of stock to Murchison the official pressures upon the bank ceased. Meanwhile, plaintiff and his wife remained owners of "six to eleven" per cent of the bank stock and were the second or third largest investors, the bank having purchased its stock held by the RFC. Plaintiff remained a director of and attorney for the bank until the instant suit was filed.

In August, 1949, Oberwortmann resigned his Federal position and was employed as president of the bank to fill the vacancy which had been created at Murchison's request. From this time on, Oberwortmann's attitude toward plaintiff changed. He became friendly, sympathetic, and a donor of gifts, and he encouraged plaintiff in his efforts to reacquire the bank stock from Murchison. He consulted plaintiff about bank affairs, referred law business to him and spoke to plaintiff of growing differences with Murchison. Oberwortmann and plaintiff confided in each other with respect to their future hopes and agreed to devote their efforts to realize these hopes. After two years this new attitude won plaintiff's confidence and trust and Oberwortmann became plaintiff's family financial adviser and plaintiff paid Oberwortmann a $2,500 fee for the services rendered.

■ The first question is whether the foregoing allegations show a fiduciary relationship between plaintiff and Oberwortmann. The allegation of Oberwortmann's cultivating and winning plaintiff's friendship and confidence after becoming bank president, with its resultant superiority, and the allegation of plaintiff's payment to Oberwortmann of a fee as financial adviser are enough to show a fiduciary relationship. (McCart-

ney v. McCartney, 8 Ill.2d 494; Fischer v. Slayton & Co., Inc., 10 Ill.App.2d 167.)

■ The allegation that Oberwortmann was plaintiff's paid agent distinguishes Cranwell v. Oglesby, 12 N.E.2d (Mass.) 81, and Vargas v. Esquire, 166 F.2d 651. (Note the dissent of Judge Major.) The complaint alleges that plaintiff learned before his sale of stock to defendants of the alleged faithless conduct of Oberwortmann, but we think that if the allegation of fiduciary relationship and faithlessness are taken as true, the sale must be considered as having been made under the influence of the breach of faith. This renders Perry v. Pearson, 135 Ill. 218, inapplicable. We think also that we should not decide that because plaintiff was a bank director, bank attorney and a successful business man he would not, as a matter of law, place trust and confidence in Oberwortmann. We need only say in this regard that Oberwortmann's experience in the important Federal position could qualify him as a desirable financial adviser for a man in plaintiff's circumstances.

■ In our opinion the complaint failed to allege a fiduciary relation between plaintiff and Oberwortmann by reason of the latter's position as bank president and director. In neither Auer v. Wm. Meyer Co., 322 Ill. App. 244, nor Northern Trust Co. v. Essaness Theatres Corp., 348 Ill. App. 134, did the facts involve stock sales between individual directors. This court in Northern Trust Co. v. Essaness noted that distinctive fact.

We continue the recital of alleged facts. While serving as a Federal official, Oberwortmann had helped the other defendants, including his brother, known as the "Joliet Banking Group," acquire controlling interests in National Banks in cities near Chicago. Oberwortmann advised plaintiff that this group was interested in joining plaintiff in repurchasing the North Shore Bank stock held by Murchison, and that Oberwortmann

"would be acting also in their behalf for this purpose." Plaintiff thereafter joined with "defendants" to repurchase Murchison's stock in the bank. This stock represented 55.3 per cent of the outstanding stock and was purchased, at $160 per share, by plaintiff and defendants in equal shares.

Before the purchase plaintiff and the "defendants" made an agreement with respect to the future policies of the bank. They made mutual promises, pledging good faith, trust and confidence, and agreed that no bank action would be taken without mutual consultation and approval, that there would be no exercise of majority power without minority consent and that none of the shares in question would be sold without first giving the other party to the agreement an opportunity to purchase. They agreed on the extent of majority and minority representation on the board. These promises of his associates induced plaintiff to join in the Murchison stock purchase transaction. The agreements were broken. Plaintiff was not consulted when Oberwortmann's salary was raised, although Oberwortmann had been elected president in January, 1952, with the help of plaintiff's minority shares and "blank proxy." Plaintiff was required, despite his ill health, to return to Chicago to prevent the salary increases. In April of 1953 the defendants "sought secretly" to acquire the stock of a nearby state bank in liquidation. At a conference with respect to this activity "defendants indicated" they would use their majority control in violation of their promises. These incidents were designed by defendants to "force" the sale of plaintiff's stock. Plaintiff advised defendants of his objections and introduced at a board meeting a resolution that acquisition of the other bank was prejudicial to the North Shore Bank's interests. His objections were unheeded. Gradually plaintiff was reduced to the status of an impotent minority stockholder. During this period he

was not well and was required to be in Arizona. He was not consulted by defendants about the operation of the bank and defendants' obligations to him were not observed. Plaintiff's will was gradually weakened by this state of affairs and he was "forced" to sell his stock on June 8, 1953, to defendants at $165 per share, substantially below its real value of $350 per share.

The foregoing recital of alleged facts underlies plaintiff's charges that Oberwortmann spearheaded a conspiracy among defendants to "deprive" plaintiff of his stock; that at first, in his official position, Oberwortmann pursued a course of conduct designed to separate Kuehnle and plaintiff and lodge control of the bank in Murchison; that having accomplished this purpose Oberwortmann as president of the bank sought and won plaintiff's trust and confidence both as a "friend" and as a paid counsellor; that Oberwortmann then conspired with his codefendants to use plaintiff's aid in gaining control of the bank, to isolate plaintiff in a weak minority position and finally to harass him by breach of contract and of faith into a forced sale of his stock; and that the conspirators gained their objective to plaintiff's great loss.

A conspiracy is an agreement or combination formed between two or more persons to do an unlawful act or to do a lawful act by unlawful means. (Franklin Union v. People, 220 Ill. 355, 376.) We need not decide whether there is anything legally wrongful in itself about relegating plaintiff to an isolated minority position in order to purchase his stock at a grossly inadequate price, because we believe the means allegedly used to accomplish the purpose state a cause of action. Oberwortmann was bound by his contract as financial adviser to serve plaintiff as a fiduciary. The other defendants are alleged to have interfered with this relationship by using Oberwortmann in breach of his contract of trust. This was unlawful for Oberwort-

226

mann, and for the other defendants, if, as alleged, they combined with Oberwortmann in the breach of trust. This is to say that defendants used unlawful means. This conclusion is supported in principle by Doremus v. Hennessy, 176 Ill. 608, on authority of Lumley v. Gye, 2 E. & B. 216, and in application of that principle by Wachowski v. Lutz, 184 Wis. 584.

If defendants, knowing that Oberwortmann was a fiduciary of plaintiff, used Oberwortmann to induce plaintiff to act with them against his own interest, they tended "to corrupt and pervert the judgment" upon which plaintiff relied, "thus inducing a recreant discharge of a duty of trust . . . a species of subtle and reprehensible fraud . . . ." (Wachowski v. Lutz, 184 Wis. 584, 594.)

It is our conclusion that the allegations setting forth a breach of fiduciary relation by Oberwortmann, and the conspiracy between Oberwortmann and the other defendants to make use of the fiduciary relationship to obtain plaintiff's stock, give rise to a cause of action against all the defendants and sufficiently inform them of the nature of plaintiff's claim of a conspiracy on their part to unlawfully force the sale of his stock at a grossly inadequate price. (Monroe College of Optometry v. Goodman, 332 Ill. App. 78, 92.) Under the allegations of his complaint, plaintiff is entitled to produce evidence of his fiduciary relation with Oberwortmann, and once "the existence of the relation has been established the fraud is presumed; and while the presumption may be rebutted by proof that the dominant party has exercised good faith and not betrayed the confidence reposed in him, the burden rests upon him to produce such evidence." (McCartney v. McCartney, 8 Ill.2d 494, 499.)

We do not think the complaint alleges a joint venture, since there is neither community of subject matter nor community of profit shown in the com-

227

plaint. (Ditis v. Ahlvin Construction Co., 408 Ill. 416.) In regard to the contract made between plaintiff and the defendants for a cooperative policy incidental to the purchase of the stock, while we do not think it is enforceable to prevent defendants from voting their majority holdings in the bank as they choose, it nevertheless places upon the defendants an obligation to deal with plaintiff in a fair, frank and open manner. (Northern Trust Co. v. Essaness Theatres Corp., 348 Ill. App. 134, 144.)

For the reasons given, the decree is reversed and the cause remanded for further proceedings consistent with the views expressed in this opinion.

Reversed and remanded.

FEINBERG, J., concurs.

LEWE, J., took no part.