TREADWAY COMPANIES,
INC., Plaintiff,

v.

CARE CORPORATION, Dr. Robert W.
Browne, Daniel Cowin, and Philip
deJourno, Defendants.

CARE CORPORATION, Dr. Robert W.
Browne and Philip deJourno,
Counterclaim-Plaintiffs,

v.

FAIR LANES, INC., Treadway Companies,
Inc., Daniel Parke Lieblich, John R.
McDonnell, Simon Gluckman, Norman
Brassler, Murray L. Cole, Samuel B. Do-
brow, and Bernard Mills, Counterclaim-
Defendants.

CARE CORPORATION and Philip deJour-
no, suing derivatively in the right and
for the benefit of Treadway Companies,
Inc., Counterclaim-Plaintiffs,

v.

FAIR LANES, INC., Daniel Parke Lieb-
lich, John R. McDonnell, Simon Gluck-
man, Norman Brassler, Murray L. Cole,
Samuel B. Dobrow, and Bernard Mills,
Counterclaim-Defendants,

and

Treadway Companies, Inc., Nominal
Defendant.

No. 79 Civ. 5066 (GLG).

United States District Court,
S. D. New York.

April 16, 1980.

Battle, Fowler, Jaffin, Pierce & Kheel, New York City, for plaintiff and the individual counterclaim-defendants; Samuel R. Pierce, Jr., Gerald J. Fields, Raymond J. Soffientini, Richard S. Lawch, New York City, of counsel.

Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendants and counterclaim-plaintiffs, Care Corp., Dr. Browne and Philip deJourno; Daniel S. Greenfeld, Stephen B. Camhi, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Cowin; Michael H. Diamond, Douglas M. Kraus, Robert W. Wien, David M. Hashmall, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

After months of extensive motion practice and pretrial maneuvering in this action involving an ongoing struggle for control over Treadway Companies, Inc. ("Treadway"), a trial was held before this Court. The following findings and conclusions have been reached.

## FACTS

The prize involved in the instant action is Treadway, a New Jersey corporation principally engaged in the operation and management of bowling centers, and in the franchising, operation, and management of motor inns. The principal characters involved are, on the one side, the incumbent management of Treadway, lead by the chairman of its board of directors, Daniel Parke Lieblich ("Lieblich"), and on the other side, Care Corporation ("Care"), a Delaware corporation with its principal offices in Michigan which is engaged in the operation of long term health care facilities and in the operation of recreational facilities, including bowling centers. Individual named defendants are: Dr. Robert W. Browne ("Browne"), who is Care's chairman of the board and is also a Treadway director; Philip deJourno ("deJourno"), Care's former president and also a Treadway director; and Daniel Cowin ("Cowin"), formerly a director and paid financial consultant as well as the largest shareholder of Treadway. A late entrant in the dispute (named but not served as a defendant in the counterclaims) is Treadway's "white knight," Fair Lanes, Inc. ("Fair Lanes"), a Maryland corporation engaged in the operation of bowling facilities, restaurants, and real estate.

The case began in January of 1978. At that time Browne approached Chauncy Leake ("Leake"), an investment banker and securities analyst who had assisted Care in its initial public offering and was a member of its original board of directors (which he rejoined in August 1978), and asked him to prepare a study of companies, including Treadway, involved in the bowling industry. In furtherance of this study, Leake suggested that he talk, on Browne's behalf, with Cowin, an investment banker whom he had known professionally since the early 1960's, and whom he knew to be a director of Treadway. (Allegedly, Leake did not know that Cowin was its financial advisor.)

Cowin, by as early as November 1, 1977, (in conjunction with his wife, who held 50,000 shares in her own account) was Treadway's largest shareholder. He did not, however, control the corporation, a fact made clear on December 21, 1977, when his request to the board of directors that he be made chairman was denied (although he was made chairman of the executive committee). Cowin had been a director of Treadway since August 1974. During that time he had also served as financial consultant to the company, a part-time position for which he was paid $500 per month until May 1, 1978, at which time his contract, at his request, was extended and his compensation increased to $1,000 per month.[1]

---

1. Cowin had also received, on or about August 22, 1974, as an inducement for him to associate with Treadway, a stock option for 30,000 shares of Treadway common stock to be exercised within a term of five years at a price of $2.75 per share. This option was exercised on or about September 20, 1977.

Browne, like Leake, knew that Cowin was a director of Treadway, and, in fact, professed to believe that Cowin was the reason for the corporation's success. (Browne also denies knowing, at that time, that Cowin was also the corporation's financial adviser but acknowledges that he learned of this prior to November 1978.) Browne agreed with Leake that talks with Cowin would be useful. Subsequently Leake called and spoke with Cowin in late February and early March 1978, and subsequently met with him. At that meeting Leake told Cowin about Browne and Care, and informed him that Care was considering buying Treadway stock.

Following this meeting, Leake telephoned Browne to let him know that Cowin would be willing to meet with him. The Browne-Cowin meeting was then arranged for March 21, 1978. During the talks (which were also attended by John Bouwer ("Bouwer"), the president of Care's bowling subsidiary Concordia Corp.) Cowin was informed that Care had just started to purchase Treadway stock on the open market, and was asked how Care, which had a considerable amount of cash on hand, could best acquire a "reasonable amount" of Treadway stock. Cowin informed Browne that, while Care could purchase the stock through a tender offer at a premium, it could also buy the same stock on the open market and thereby avoid paying the premium. Cowin, however, also claims he told Browne that he had no interest in selling his own stock.

Leake again met with Cowin on April 5, 1978, and once more discussed the purchase of Treadway stock. Cowin did not inform any one at Treadway about this or any of his prior meetings and contacts with Care. Although all involved parties profess to have failed memories concerning these contacts, contemporaneous documents indicate that they were then thought important by all involved.

Care's first purchases of Treadway stock occurred about the time of these meetings. These purchases were made by Leake, who, although no specific volume or dollar limita-

tion had been placed on his power to buy, realized that he should consult with Care before purchasing blocks costing $10,000 or more. Leake was directed to buy near the bid side in order to avoid putting upward pressure on the price of the stock. Leake continued to make such purchases through April.

At the same time as Care's interest in purchasing Treadway stock was developing, Treadway was considering a "spin-off" of its then unprofitable Inns Division. In furtherance of this, a report was prepared by Helmsley-Spear, Inc. on the liquidation value of the inns. This report was discussed by Cowin and Lieblich with representatives of Helmsley-Spear, and was a topic of discussion at the March 8 board meeting of Treadway. Subsequently, on April 7, 1978, Lieblich sent to all directors, including Cowin, a letter marked confidential, stating that the liquidation value of the Inns Division greatly exceeded its going concern value, even though its earnings were improving.

Care's interest in Treadway continued. In April 1978 Bouwer visited all or most of Treadway's inns and all but two of its bowling centers. Thereafter, inquiries were made to Cowin concerning the spin-off, and subsequently Leake and Cowin met on June 6 to discuss the likelihood that the spin-off would actually be carried out.

At this time Care's ownership in Treadway was approaching 5% and as a result Care would soon be required to file a Schedule 13D with the Securities and Exchange Commission ("SEC"). Accordingly, Leake suggested that a meeting between Browne and Lieblich be arranged so that Care could explain its intentions prior to the filing. At the meeting which took place on June 30, 1978, Browne informed Lieblich that Care had bought the shares for investment purposes only. Lieblich asked Browne whether he would be interested in obtaining a position on Treadway's board and Browne said that he would not. Also discussed was the possibility of a merger by the two companies and the sale by Care to Treadway of Care's bowling interests. Both subjects

were raised by Lieblich. In a further discussion by telephone on July 12 between Lieblich and Leake, Lieblich renewed his offer to buy Care's bowling concerns. At none of these discussions was any mention made of Cowin's prior contacts with Care, and Leake's notes of his conversation specifically state: "No mention of Cowin."

On July 17, 1978, Care filed its Schedule 13D with the SEC. It indicated that Care then owned 7.16% of Treadway stock and stated that Care's current purpose in obtaining the stock was as an investment.[2]

Meanwhile, the proposed spin-off was moving forward. In furtherance of it, Treadway's SEC counsel, Lawrence Bangser, sent a letter and memorandum, on or about June 23, 1978, to all directors indicating that they should not trade publicly in Treadway stock because of the spin-off. This directive was repeated in a memorandum sent by Bangser on August 22 to the directors stating that, as a necessary requirement for the effectuation of the spin-off, a representation had to be made that they had no present intention to sell their Treadway stock. Soon after, Cowin, Lieblich, and a partner of Bangser discussed this memorandum. Subsequently, on August 24, 1978, Cowin indicated at a meeting of the board of directors that he had no present intention to sell his shares. He made no mention of his contacts with Care. Bangser sent another letter on October 6 to the directors, this time stating that the spin-off was unlikely to get favorable tax treatment unless all the directors signed an Internal Revenue Service ("IRS") intent letter stating that they had no present intention to sell their stock. He also noted that Care was willing to sign such a letter provided that the officers and directors of the company did so.

Cowin's contacts with Care were continuing at this time. Cowin had been invited during the course of his meeting with Browne on March 21, 1978, to visit Care's offices and facilities in Grand Rapids. On September 11, he made the trip, accompanied by Leake, and returned the following day.

Prior to leaving for Grand Rapids, Cowin had informed Lieblich about his impending visit. Lieblich, who was extremely unhappy about this (believing that he should be present at any discussions), called immediately upon Cowin's return to ask about the trip. Cowin reported to him that Care's purpose in buying Treadway stock was purely as an investment and that they were happy with the current management of Treadway. Participants at the Grand Rapids meeting testified that, concerning Treadway, only the proposed spin-off was discussed.

Cowin apparently began to consider the sale of his stock sometime during the summer of 1978. It was not until October, he claims, that he first informed Leake that he was interested in selling his shares, (assuming that Leake would speak with Browne). Cowin represented that he had 175,000 shares (about 14% of Treadway's outstanding stock) for sale, which included shares owned by his wife and by his real estate partner. Leake relayed this information to Care and subsequently met with Cowin, who stated that his price for the sale was either $9 a share if paid on a pay-out basis, or some lesser price if paid in cash. Ultimately, Browne and Cowin agreed on a price of $9 per share to be paid partly in cash and the rest over a three-year period.

During this period Cowin was refusing to sign the IRS intent letter. Believing that Cowin's refusal jeopardized the proposed spin-off, Lieblich arranged to meet with Cowin on October 18. The meeting did not proceed harmoniously. Lieblich informed Cowin that if he was unhappy with the way the company was being run and wished to sell his stock he should consider selling his shares back to the corporation. Cowin, in turn, told Lieblich that he did not believe that Treadway could afford such a purchase and that he believed there would be a prob-

---

**2.** An amendment to the Schedule 13D was filed on August 14, 1978, which indicated that Care then owned 8.57% of the stock. This figure was thereafter amended to 8.96% on August 29 as purchases continued.

lem in a director, who was also the largest stockholder, making such a sale. Cowin did not reveal to Lieblich that he had already discussed a sale with Care. Nor did he disclose it on October 25, when he met again with Lieblich and some of the other directors, or at a board meeting held the next day. On both the 25th and 26th, however, he did state that the spin-off was no longer a good idea economically and that he no longer favored it. At the October 26 board meeting, Cowin was renominated as a director. The Treadway board subsequently determined that the proposed spin-off was not in the best interests of the corporation and should not be carried out.[3]

On October 30, Care filed its third amended Schedule 13D, stating that it owned 10.18% of Treadway stock and that, although its purpose in acquiring the stock was for investment, Care would consider discussing or consulting with the management of Treadway regarding corporate affairs.

The Cowin-Care stock sale was closed on November 9, 1978. The terms of the three parallel agreements provided for the sale of 175,000 shares (including the shares of Mrs. Cowin[4] and of the partnership) at $9 per share, 20% of which was to be paid in cash upon the settlement, another 20% to be paid on January 15, 1979, and the rest to be paid over the next three years. The future payments were evidenced by notes at 6% interest, all of which were secured by the shares sold and were, except for the last one, nonrecourse. The per share present value of the sale has been calculated at $8 a share, representing a premium of about 35% over the market price.

Lieblich testified that, if given the chance, Treadway could have afforded to buy the Cowin stock, even at the premium actually paid. He also testified that, had he known that Care was the proposed purchaser and that it was intent on a takeover, he would have hired investment bankers and lawyers to assess the situation. The evidence does not support Lieblich's testimony. In order to have consummated a deal with Cowin, Treadway, with its enormous working capital deficit, would have had to borrow the funds necessary and divert funds needed for capital and operating purposes. Yet, for all this, the only purported benefit to the shareholders would have been an increase in the per share earnings of the company—at best a minimal gain.[5] It is clear that the principal effect of, and the only reason for, a purchase by Treadway of the Cowin stock would have been to enhance the likelihood of incumbent management's retaining control over the corporation. These facts compel the conclusion that the purchase of the Cowin shares by Treadway would not have been in the best interests of its shareholders at that time and should not have been undertaken.

Cowin informed Lieblich about the sale of the 175,000 shares to Care[6] on November 10, 1978. Displeased by this turn of events, Lieblich asked Cowin what his present intentions were as to staying on the board. Cowin indicated that he would leave it up to the other members. Lieblich, believing that Cowin should not remain a director, thereafter informally polled the board and found that the consensus was that Cowin should not continue as a member. Thereafter, Lieblich informed Browne that the board wanted Cowin removed and asked if he would fill the vacancy. Browne replied that he wanted Cowin to remain on the board. Nevertheless, on or about December

---

**3.** In view of this the Court, finding that, even if Cowin had intentionally delayed the proposed spin-off, Treadway and its shareholders had suffered no harm or damage from such conduct, dismissed prior to trial Treadway's claim arising from the alleged spin-off delay. *Treadway Companies, Inc. v. Care Corp.,* 490 F.Supp. 660 (S.D.N.Y.1980).

**4.** The proceeds of the sale of Mrs. Cowin's stock were deposited in her personal account.

**5.** In fact, it became apparent at trial that, contrary to Lieblich's assertions, Treadway was interested at that time in selling, rather than buying, its own shares.

**6.** At about this time, Cowin also signed a no-sale representations with respect to the $1,000 shares which he had not sold.

9 or 10, Lieblich called Cowin and stated that, in light of the board's decision, Cowin should remove his name from the proxy materials filed with the SEC. Cowin refused. At a special meeting of the board held on December 19, however, Cowin finally, under pressure, consented to step down.

Care had filed its fourth amended Schedule 13D on November 14, in which it set forth the details of the Cowin transaction and stated it then owned 24.21% of Treadway stock. (By mid-December this figure had reached approximately 26%.) In view of this large interest, Lieblich, at a luncheon meeting with Browne on December 19, inquired whether this might not be a takeover attempt. Browne denied this, saying "I don't even know what a takeover situation is." He also stated that Care's intentions were purely for investment, and that the purchase of Cowin's stock was made so that Care could start equity accounting. In view of all the facts, the Court does not find this claim to be credible. It developed at trial that Cowin and Browne had discussed a possible tender offer on both March 21 and December 19; that Bouwer, in a memorandum of December 14 sent to Browne, had suggested that Treadway might become "the full time job of more than one of [its] top management" and that Care should pursue [its] Treadway investment until [it understood] the management and financial resources it will require to conclude it"; that Care owned 26% of Treadway; that Browne had discussed a tender offer with Cowin's SEC attorney Fred Gerard on December 21, and wrote to Cowin about it again on January 5, 1979; and that Browne had some recollection that Leake might have suggested a merger or tender offer in a conversation with Bouwer. From these facts and others, the Court concludes that, at least by the time of the acquisition of Cowin's stock, Care had decided to seek control of Treadway.

On the evening of December 19, Cowin had Leake and Browne to dinner. Among the topics of discussion there were Cowin's removal from the board, the character of the various directors of Treadway, and the ability of Fred Gerard ("Gerard"), Cowin's attorney, who had accompanied him to the meeting. Subsequently, Cowin provided Browne with Gerard's telephone number, and a meeting was arranged between Browne and Gerard for December 21. Browne also asked Leake to attend this meeting, and explained to him that its purpose was to discuss Treadway-Care relations with Gerard, an attorney who was close to "the Treadway situation."

The next day, Lieblich, on the request of the directors, formally invited Browne to fill the vacancy. Browne stated that he was too busy, but suggested that deJourno be considered. At the annual meeting held on December 20, deJourno was elected a director of Treadway.

Intermittent contacts between Cowin and Browne continued into 1979. As has been previously noted, on January 5 a letter was sent from Browne to Cowin. In it Browne mentioned, among other things, that deJourno would be in New York City on January 11 and would ask Cowin how best to proceed with Lieblich and his "group."[7] (Browne testified that he assumed "group" meant the board.) In the letter, Browne also mentioned his desire to "get close to [director] Sam Dobrow and whoever [sic] else you think appropriate." Browne further informed Cowin that he had spoken to Gerard and that Gerard had "painted a black picture regarding a tender offer just yet," a statement which Browne attempted to explain at trial by contending that the conversation with Gerard had been purely "academic." Browne additionally made clear in this letter his growing dislike for Lieblich, mention of whose name made Browne's "blood boil."

On January 25, Browne telephoned Cowin. In this conversation Browne mentioned that Care was considering requesting a second place on Treadway's board. This request was also referred to in Care's fifth amendment to its Schedule 13D, filed on February 14, 1979, which stated that Care's

---

7. This deJourno-Cowin meeting did in fact take place on January 11.

purpose in purchasing Treadway stock continued to be investment, that it intended to seek two additional members on the Treadway board, and that it then owned 26.1% of Treadway stock. More importantly, for the first time, Care set forth five possible alternative courses of conduct with regard to Treadway, including proposing a merger or other business combination, proposing a purchase of stock by Care from Treadway, and seeking control of Treadway through stock purchases.

On February 23, Browne and Lieblich met and discussed possible increased representation for Care, with Browne insisting that both he and Bouwer be added to the board. Lieblich also raised the subject of the amended 13D and mentioned that the board was willing to discuss a merger. Browne, however, stated that he had no real interest in a merger, tender offer, or anything else, that the 13D was simply attorney's "boiler plate," and that Care's sole interest in Treadway remained as an investment. Browne made no mention of his contacts with Cowin, Leake or Gerard. The Court concludes, however, that, despite Browne's disclaimers, at least by this time Lieblich was becoming increasingly aware of and concerned about the possibility of a Care takeover.

Later that day, a meeting of Treadway's board of directors was held, at which Browne, but not Bouwer, was asked to become a director, and thus become Care's second representative. During the course of the meeting, Browne again reiterated that Care's interest in Treadway remained for investment. Also during that meeting, the board considered whether to take any action against Cowin with respect to his sale of stock. Both Care and Cowin provided outside legal opinions as to the propriety of the sale; no action was then taken, however, and no further action was taken until the initiation of the instant action.

During the spring of 1979, Care continued to seek the advice of Cowin. At Leake's suggestion, a meeting took place in New York on June 4, at which time Bouwer asked Cowin for his appraisal of the inns, since Lieblich, with a group of his associates, was then considering purchasing them from the corporation.[8] Browne also wrote to Cowin on May 8 suggesting various meetings, including one with Leake, Cowin, and himself and a possible meeting of himself with Gerard, depending on the events of the next month. Cowin subsequently informed Browne that Gerard would be available to meet with him on the 21st or 22nd of May.

On the evening of June 21, Browne, Cowin, and Leake had dinner together in New York City, during which the possibility of a tender offer for Treadway was discussed. Thereafter, on June 29, Care, which had not bought any Treadway stock since late 1978, resumed its open market purchases.[9]

In June or July, at or about the time that Care was again purchasing Treadway stock, Browne, along with deJourno and Bouwer, met with Gerard to discuss the relationship between Care and Treadway. Prior to this meeting Gerard advised Cowin that this discussion was to take place. Subsequently, at times during August, Gerard met or spoke with Browne and deJourno. He also met with Leake during the summer. All of these conversations concerned Treadway-Care relations. By late summer, Leake had also talked to various people at Care about a proposed complete slate of Care directors for the Treadway board. A list of potential candidates was prepared, including Browne, Cowin, Cowin's real estate partner Shuldiner, attorney Gerard, and Leake. By August 24, Care's ownership of Treadway had increased to 27.1%, and by September 10 to 29.6%.

8. At a Treadway board meeting held on June 21, certain material relating to the valuation of the inn properties, including some confidential financial information, was discussed.

9. Browne stated that the reason for purchasing at that time was to try to "make [management] responsive" to their demands, and not to effect a takeover. In that vein Browne wrote to the other Treadway board members on July 24 severely criticizing Lieblich on a variety of significant issues.

Apparently fearing that a gradual take-over by Care was in progress, and aware that Care was fast approaching ownership of 33.3% of the outstanding shares (which, under New Jersey law, would allow it to block any proposed merger or consolidation (N.J.Stat.Ann. § 14A:10–3(2)), Treadway, on September 25, filed the instant complaint against Care, Browne, deJourno, and Cowin. The complaint alleged violations of sections 10(b) (and Rule 10b–5 promulgated thereunder), 13(d), and 16(a) of the Securities and Exchange Act (the "Exchange Act"), violations of various New Jersey statutes, and breaches of common law fiduciary duty. Treadway thereafter moved for a preliminary injunction. On October 12, this Court, finding that plaintiff had failed to demonstrate both likelihood of success on the merits and irreparable injury if injunctive relief were not granted, vacated a temporary restraining order then in effect and denied the motion for a preliminary injunction. *Treadway Companies, Inc. v. Care Corp.*, [1979] Fed.Sec.L.Rep. (CCH) ¶ 97,139 (S.D.N.Y.1979).

The filing of the instant action was not the only step that Treadway's incumbent management took in order to protect its interests. In March or April of 1979 (well before the commencement of this suit), Lieblich, apparently worried by the contents of Care's February amendment to its Schedule 13D, contacted William Sword ("Sword") of William Sword & Co., Inc. ("Swordco") to inquire about the possibility of retaining it as Treadway's investment bankers. Lieblich made a formal offer in June, at which time Swordco accepted.[10]

Lieblich's stated purpose in obtaining the services of an investment banker was to assist Treadway in considering the various business alternatives available, and to determine whether any potential merger candidates, other than Care, existed. Lieblich specifically informed Swordco that he had concluded that a merger with Care would *not* be in the best interest of the shareholders. Thereafter the board directed Swordco to engage in a study of both Care and Treadway and to determine and report on the possible alternatives to an affiliation with Care. Despite the importance allegedly attached to this project, however, Swordco presented no report as to a suitable merger partner, nor did the Treadway board consider any merger candidates, between the time of Swordco's retention and the holding of a special board meeting on November 13, 1979.

Lieblich, however, continued to look for ways to avert a takeover by Care. He called Sidney Friedberg ("Friedberg"), chairman of the board of Fair Lanes, and inquired whether Fair Lanes, which at the time was negotiating a possible business combination with Penn Central, would object to his contacting Penn Central to see if it had an interest in either acquiring or merging with Treadway. Friedberg asked Lieblich to hold off for six weeks, at which time he promised to communicate further on the subject.

Prior to Lieblich's telephone call, Fair Lanes had been generally aware of the Treadway-Care situation. As a result of this call, however, Fair Lanes, which had not effected any acquisitions since the early 1970's, began to focus its attentions on Treadway as a possible acquisition target. Thereafter, when in October Lieblich called to ascertain the status of the Penn Central talks (which had terminated), the conversation instead turned to the possibility of a Fair Lanes acquisition of Treadway. This discussion was continued at an October 19 meeting between Lieblich and Fair Lanes management, at which Lieblich reiterated his interest in finding a company willing either to invest in, or to acquire, Treadway. The representatives of Fair Lanes, in turn, expressed interest in a merger, but stated that, in view of Care's sizable percentage interest in the company, they would be hesitant to enter into any serious merger negotiations unless Treadway could provide that

10. Swordco's retention was subsequently approved by Treadway's board of directors at its June meeting.

any agreement between the companies could actually be consummated. The Fair Lanes representatives noted that its acquisition of a large block of Treadway's authorized but unissued stock would, to some degree, neutralize Care's interest in the company. Fair Lanes management subsequently determined that such a purchase should be the first step in its dealings with Treadway, so that it could influence the vote both for the election of Treadway's directors and for approval of a merger (as to which a two-thirds vote was necessary).

During mid-October, while the Fair Lanes talks were going on, Swordco received an indication of interest from Penn Central as to the possibility of entering into merger discussions with Treadway. This overture, however, as well as several others received by Swordco, was, in light of instructions from Lieblich to devote its energies to the Fair Lanes transaction, neither pursued nor fully investigated by Swordco.[11]

A meeting of the Treadway board of directors was held on October 25. At the meeting, a motion was proposed to authorize the making of loans to Treadway employees so they could exercise stock options in the company. The motion was passed, with Browne and deJourno abstaining. Also considered was a resolution nominating as directors the incumbents Gluckman, Dobrow, Lieblich, and Browne. Care, as it had indicated it might in its September 28 amendment to its Schedule 13D, proposed an amended slate consisting of, among others, Bouwer and Leake, in addition to Browne. This amendment was defeated and the resolution nominating the incumbent directors was approved. During the meeting, no mention was made of the ongoing discussions with Fair Lanes.

The representatives of Fair Lanes and Treadway met again on October 29, at which time Fair Lanes outlined a possible merger proposal. According to the proposal, the merger was to be accomplished by a market-for-market exchange and would result in Fair Lanes' ownership of 81.6%–81.7% of the combined company.[12] The merger itself, however, was to involve transfer by Fair Lanes of only its bowling assets and not substantial other assets, which were to be retained by the company. The parties concluded that, as Fair Lanes had previously determined, the first step in their negotiations would be the sale of a large block of Treadway stock, consisting of 240,000 shares (the maximum number which, in theory, could be issued and listed under American Stock Exchange ("AMEX") guidelines without the necessity of shareholder approval), thereby diluting Care's voting power and also giving Fair Lanes an equity interest in the company.[13]

Agreement was reached on the sale of the 240,000 shares on November 4. Under the terms of the sale, the per share price was to be $6.50 (the approximate market price that day), and Fair Lanes was to be afforded the right to "put" the shares back to Treadway for a six-month period commencing on the date of the actual sale. Implicit in the terms of the sale, and an essential justification for Treadway in entering into it, was that Fair Lanes would obtain the ability to vote this stock at the annual meeting.

Even though agreement on the sale was achieved on November 4, at Treadway's request Fair Lanes made no formal offer for the shares until November 12, thereby assuring that only the minimum permissible notice of the transaction be given to Browne and deJourno in advance of the

11. Swordco claims that it had concluded that the various indications of interest were not meaningful and would not have been pursued by the potential merger candidates.

12. Fair Lanes contemplated purchasing Treadway shares at market price. It believed, however, that the value of those shares was such that, in the event a merger was not consummated, the sizable block of shares it proposed to acquire could be sold at a significant premium above the market price.

13. Lieblich asserted at that time that, notwithstanding the size of Care's holdings, he could win a proxy fight against it. This statement was questioned by Fair Lanes.

regularly scheduled meeting of Treadway's board on November 15.[14]

Prior to the consummation of the sale, however, a hitch developed when the AMEX, whose approval had been assumed, unexpectedly objected to the transaction in the absence of prior shareholder consent and indicated that it would not favorably regard an application to list the shares. As a result, Fair Lanes, which had hoped to avoid a shareholder vote on the transaction (which would delay the sale and thus provide time for Care to take steps either to prevent the transaction or possibly to take control of Treadway), determined, along with Treadway's management, that the deal, as structured, had become unfeasible and should not be effected.

A restructured deal was then rapidly (so as to foreclose any possibility that Care could force the early holding of a shareholders meeting) negotiated for the sale of approximately 65,000 shares of Treadway treasury stock and 200,000 shares of a newly created class of Series A preferred stock. As finalized on November 9, this transaction provided that the preferred shares be mandatorily redeemed by Treadway on September 30, 1980, at cost plus accumulated dividends. The deal also provided that, in the event of default by Treadway as to redemption, Fair Lanes be afforded the right to name a majority of members to the Treadway board. Additionally, Fair Lanes was given the exclusive right to conduct merger negotiations with Treadway for a period of four months and was guaranteed indemnification from Treadway. Importantly for both parties, this agreement, while requiring the approval of the Treadway board, was not subject to a shareholder vote.[15]

Care's November 2, 1979 amendment to its Schedule 13D disclosed that the company had decided to propose its own slate of nominees for election to Treadway's board of directors and that it would solicit proxies in support of that slate for the upcoming annual shareholders meeting. This disclosure was thereafter made the subject of discussion at a special meeting of the Treadway board held on November 13. At that meeting a previously prepared resolution, which stated that a takeover by Care would not be in the best interests of the shareholders and should be resisted by the board, was introduced and passed. The board further resolved that it was in the best interests of the shareholders to explore the desirability of a merger with Fair Lanes and authorized management, to proceed therewith [16] if agreement could be reached for the sale at $6.50 a share of the 65,000 shares of treasury stock and the 200,000 shares of the preferred.

As the negotiations neared fruition, the management of Fair Lanes, in response to demands from its board to be provided with appraisals of the Treadway facilities, conducted an extensive inspection (including personally visiting nineteen of twenty-four centers) and analysis of Treadway's bowling center. In addition, assorted confidential nonpublic information relating to these appraisals, and to other matters, was requested from and provided by the management of Treadway. Thereafter, Fair Lanes management met to review the results of these inspections and to perform comparative analyses with Fair Lanes bowling centers. By contrast, neither Treadway management nor any representative of the company inspected any of the Fair Lanes facilities during the course of the negotiations.

14. Notice as to a special meeting to be held on November 13 was timed so as to arrive (which it did) at Browne's office in Grand Rapids on Saturday, November 10.

15. Also agreed upon was that the preferred shares were not to be sold by Fair Lanes without first obtaining consent from Treadway, and that Treadway was to have the right of first refusal as to any sale of the treasury stock.

16. At the meeting, a legal opinion was rendered as to the propriety of Treadway's actions, and Swordco was asked to provide an opinion on the fairness of the sale. Browne asked a series of twelve questions about the transaction. Lieblich, however, declined to answer most of them.

In an attempt to prevent this second proposed Fair Lanes transaction from being consummated, Care, which had, at the time of the first proposed sale, filed counterclaims alleging breach of fiduciary duty and violation of section 10(b) of the Exchange Act and Rule 10b-5, amended those counterclaims and moved to enjoin the sale. On November 15, 1979, this Court issued a temporary restraining order which, while not restraining the sale, enjoined the voting at the next annual Treadway shareholders meeting of any of the preferred stock issued to Fair Lanes.

On November 17 the board of directors of Fair Lanes met and approved the terms of the proposed transaction. It also determined that, in light of the Court's order, unless the temporary restraining order was lifted, the company would not go forward with the deal. Thereafter, on November 19, an agreement between Fair Lanes and Treadway was signed. The effect of this agreement, however, was contingent upon the satisfaction of certain conditions precedent placed by Fair Lanes, which required that within thirty days of signing the management of Treadway must recommend to its board of directors that a merger or business combination with Fair Lanes be entered into, and also required that the Court have vacated its temporary restraining order.

On November 27, 1979, this Court entered a preliminary injunction enjoining the sale of any preferred stock which could despite the mandatory redemption, be voted at the next annual meeting. No other aspect of the Fair Lanes-Treadway agreement, including the sale or voting of the treasury stock, was enjoined.[17] *Treadway Companies, Inc. v. Care Corporation,* 490 F.Supp. 660 (S.D.N.Y.1979).

As a result of this injunction, Fair Lanes and Treadway decided not to proceed with the second proposed deal. Lieblich also determined that, since Care's percentage interest in Treadway remained undiminished,

the annual shareholders meeting would not, as initially contemplated, be held in December. Lieblich directed Swordco to attempt to structure a new transaction pursuant to which shares with full voting rights could be sold to Fair Lanes.

In the negotiations to structure a third transaction, the parties focused upon a plan to sell 230,000 shares of stock to Fair Lanes, 67,000 of which was to be treasury stock and the rest to be authorized but unissued shares. As to this stock, the parties, which continued to be extremely concerned about a possible Care takeover, recognized that, even if Fair Lanes were able to acquire the stock, Care might still remain sufficiently strong to be able to block a merger. The parties did believe, however, that if Fair Lanes was able to vote its shares, it, in conjunction with Treadway management (and the shares management controlled), would have a good chance of preventing a Care takeover of the Treadway board. The parties hoped that, if incumbent management retained control of the board, an extended stalemate would ensue, which would prove unacceptable to Care and would eventually force a resolution of the confrontation in a manner allowing Fair Lanes to consummate the merger.

The proposed agreement also provided protection for Fair Lanes in the event that this Court interfered with the transaction. Under the terms of the agreement, Fair Lanes was afforded the right to rescind its purchase and recover its purchase price if it was precluded from voting the shares for election of directors at the annual meeting. Similarly, if allowed to vote the shares at the annual meeting but then barred from voting on the proposed merger, Fair Lanes could vote for the directors and then exercise its right to rescind. The agreement additionally provided that Treadway be afforded a right of first refusal with respect to any proposed sale of the shares by Fair Lanes, and that Treadway would nominate

---

17. The Court also noted that it hoped the duration of the injunction would be short and that

all of the various claims should be resolved as quickly as possible at a trial on the merits.

three Fair Lanes representatives to serve on the Treadway board of directors.[18]

Meanwhile, merger negotiations,[19] which had commenced on November 28, were also taking place between Treadway and Fair Lanes. As previously agreed, the basis for the proposed merger was to be a share-for-share exchange between the two companies. Lieblich, who had agreed to such an exchange basis at the time when he believed that all of Fair Lanes' assets were to be included, persisted in his view that an exchange of this nature would be fair even when informed of the various assets to be excluded. Lieblich had reached this conclusion despite the fact that he never received a complete analysis of the value of the excluded assets (though he was advised of the earnings attributable to them). And, despite having been advised that the book value of the excluded assets was such that their exclusion could result in reducing the overall book value of the assets transferred by as much as 20%, Lieblich insisted that their exclusion was not significant since, he stated, these assets did not contribute substantially to the earnings of the company.

On December 20, the Treadway board met to discuss the situation. At that time they were informed that the previous agreements with Fair Lanes had expired and that a tentative new agreement had been reached, which would result in a business combination between the two companies. They were also told about the proposed sale, to be made exclusive of any merger proposal, of the 230,000 shares to Fair Lanes, as to which closing was near. Various Swordco materials relating to the sale, which had been given to all directors

but Browne and deJourno during an informal meeting the night before (to which they had not been invited) were, during the course of the meeting, given to these two Care representatives. Thereafter, Lieblich endeavored to explain the various purposes to which, it was contemplated, Treadway would put the funds obtained on the sale of stock.[20] He also noted that, despite the positive aspects of the sale, in light of the dilution of shareholder interest stemming from the issuance of the 230,000 shares, the effect on the balance sheet might actually be to reduce the projected earnings per share.

The board, despite the opposition of Browne and deJourno and the observation of one of the outside directors that, if the proposed merger were to go through, Fair Lanes would, in effect, get back most of the money paid for the Treadway shares, authorized management to issue, sell, and deliver the 230,000 shares of common stock to Fair Lanes for $6.50 per share pursuant to the sale agreement. The board also approved a resolution providing that, subject to the consummation of the sale agreement, the number of directors would be raised to eleven and that three Fair Lanes nominees would be included (and Browne dropped)[21] in the slate recommended at the next annual meeting. Both resolutions were passed by a vote of six to two (Browne and deJourno) with one abstention (Dobrow). The board was not presented with a definitive proposal at that meeting as to the terms of the anticipated business combination and was given additional time to consider the merger.

18. In order to add the three Fair Lanes' representatives, it was planned that the board of Treadway be expanded to eleven members, and the earlier proposed nomination of Browne was to be dropped.

19. The success of these merger negotiations within thirty days had been a condition precedent to the effectuation of the second proposed Fair Lanes transaction.

20. Lieblich testified that he intended to use the $1.3 million to satisfy a debt with the New Jersey bank, on which Treadway was paying

interest of 2% over prime. (He had previously informed the board, however, that he had renegotiated the debt and reduced the interest rate to .75% over prime.) He further stated that the proceeds would also be used to purchase a minority interest in the Newport Harbor Associates and that the balance would be used to acquire cash stock which would be available in the event the Court ruled that Care must sell its shares back to Treadway.

21. deJourno's term of office did not expire for another year.

On December 27 the board reconvened. Sword distributed to the directors an opinion letter of Swordco addressing the questions of the fairness of the sale of the 230,000 shares to Fair Lanes and the fairness of the merger proposal as then defined. While the board was advised that certain assets of Fair Lanes were to be excluded from the merger, they were not given the values of either the assets to be conveyed or the assets to be withheld (though they were told the book value of certain of the excluded assets). Although the anticipated merger consisted of a sale of Treadway stock to Fair Lanes and the subsequent exchange of Treadway stock for certain Fair Lanes assets on essentially a share-for-share basis, Swordco did not express an opinion as to the value of either stock.

During the course of the meeting, the representative of Swordco present attempted to enumerate various advantages which allegedly would flow from the merger. The principal advantage for the Treadway shareholders, it was stated, was the payment of an 11.8% premium by Fair Lanes as the result of the share-for-share exchange. Because of the fluctuations in market price taking place since December 20, however, the shares of the two companies were being traded at the time of the meeting at approximately the same price, which, as Browne observed, eliminated any premium which initially was to be paid. In fact, by the time of the December 27 meeting, if any premium remained part of the transaction it was being paid *by* Treadway, which was exchanging its shares for substantially less than all of the assets of Fair Lanes.

Another alleged advantage recited at the meeting was the depth of management that would be created by combining the management of both companies. In reality, however, only Lieblich of all of Treadway's

management team was given a specific commitment at that time as to his future employment, and it was contemplated that he would concentrate exclusively on Inns Division of Treadway. Thus, it was hardly anticipated that any combination of management would take place. Additionally, the claimed advantage stemming from the ostensible efficiencies of operation and from savings on various administrative and corporate costs (such as expenses for audits, SEC filings, etc.) seemed more illusory than real.[22] Swordco made no attempt to estimate the savings that could be anticipated in any of these areas, and, in fact, testimony at trial indicated that they would, at best, be minimal.[23]

The transaction with Fair Lanes and the anticipated business combination was the culmination of a plan of action intended to prevent Care from taking control of the corporation. In furtherance of this plan, the board, by a five to two vote (with Browne and deJourno voting against), approved the stock purchase agreement presented. Included within this agreement was a statement approving management's recommendation as to the basic terms of the proposed business combination, although the combination itself was left subject to the preparation of a definitive agreement between the parties, which would thereafter be submitted to the directors and shareholders of both companies for approval. Considered crucial to the success of the transaction was the sale of the 230,000 shares of common stock, which was effected immediately after the December 27 meeting, and which was unconditional except in the event that Fair Lanes was prevented from exercising full voting rights, in which case it could rescind. These shares served to dilute the interest of Care and other Treadway shareholders and were

22. Swordco acknowledged that individual bowling centers, of necessity, made many purchases locally and that no economies would be had as to those purchases.

23. At no time during the meeting did the board discuss the possibility or desirability of entering into a merger or business combination with any entity other than Fair Lanes, and as mentioned before, Swordco noted that none of the other companies which had expressed an interest in Treadway, which expressions of interest had not been pursued, had presented a serious approach. Nor was there any discussion of any need for additional capital or of the need to sell stock in order to raise cash.

openly issued for the purpose of influencing both the vote on the election of directors and the subsequent vote on the proposed merger.

In view of the pendency of this latest transaction, Care amended its counterclaims so as to encompass the new deal and moved to enjoin the sale of the 230,000 shares. Due to the pendency of the trial, however, the Court reserved decision on the motion.[24]

A trial on all remaining claims was held before the Court from January 21 to February 6, 1980, and the following is the decision of the Court.

*Discussion*

Jurisdiction as to all claims and counterclaims (except for the cause of action asserted by Care under Rule 10b–5) in this action is based upon diversity of citizenship. As Treadway is a New Jersey corporation and the state law claims are based upon the law of New Jersey, as well as common law principles of conduct, this Court must apply New Jersey law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

Defendant Daniel Cowin was, prior to December 19, 1978, a director and paid financial consultant to Treadway, as well as being its largest, though not controlling, shareholder. As such, he owed the corporation a high duty of fiduciary care. *See Daloisio v. Peninsula Land Co.*, 43 N.J.Super. 79, 127 A.2d 885 (App.Div.1956); N.J. Stat.Ann. §§ 14A:6–14 (1959). *See also Perlman v. Feldmann*, 219 F.2d 173, 178 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Field v. Oberwortmann*, 14 Ill.App.2d 218, 144 N.E.2d 637

(1957). The plaintiff now alleges that, in entering into discussions with Care and eventually consummating a sale for 175,000 shares of stock with them, Cowin breached this duty of care and must be held accountable for it.

■ It is well established that an individual does not by virtue of becoming a director or paid officer of a corporation lose the right to sell, even at a premium, his shares in a corporation. *Keely v. Black*, 91 N.J.Eq. 520, 111 A. 22 (1920). *See also Du Pont v. Du Pont*, 256 F. 129 (3d Cir.), *cert. denied*, 250 U.S. 642, 39 S.Ct. 492, 63 L.Ed. 1185 (1919); *Wellman v. Dickinson*, 475 F.Supp. 783, 834–35 (S.D.N.Y.1979). Nor does the fact that that individual is the largest shareholder in the corporation preclude him from selling. *See, e. g., Clagett v. Hutchison*, 583 F.2d 1259 (4th Cir. 1978); *Swinney v. Keebler Co.*, 480 F.2d 573, 577 (4th Cir. 1973); *McDaniel v. Painter*, 418 F.2d 545, 547 (10th Cir. 1969).[25]

■ In the instant action, the Court finds that Cowin breached no duty in selling his shares to Care. No evidence was presented at trial, nor does the Court have any reason to believe, that in any of his discussions or dealings with Care, Cowin passed on any confidential or proprietary information to Care either to induce it to purchase his stock or to aid it in a planned takeover of Treadway. Nor did Cowin by selling his shares in any way usurp a corporate opportunity of Treadway, or act in competition with the corporation. *See, e. g., Katz Corp. v. T. H. Canty and Co., Inc.*, 168 Conn. 201, 362 A.2d 975 (1975); *Vulcanized Rubber & Plastic Co. v. Scheckter*, 400 Pa. 405, 162 A.2d 400 (1940). A corporation,

---

**24.** Upon completion of all discovery, the defendants moved to dismiss the complaint. (No such motion was made as to the counterclaims.) In its decision of January 18, 1980, the Court granted the motions as to the counts based upon sections 13(d) and 10(b) (and Rule 10b–5) of the Exchange Act and the count against Cowin relating to the proposed spin-off. It denied the motion as to the claims brought under state and common law standards of fiduciary duty. *Treadway Companies, Inc. v. Care Corp.*, 490 F.Supp. 660 (S.D.N.Y.1980). Treadway's claim allegedly setting forth a

cause of action under section 16(a) of the Exchange Act was voluntarily withdrawn.

**25.** A duty is owed when a person is a majority or controlling shareholder, which Cowin was not, who may not sell his shares to a purchaser who he knows, or at least has reason to know, intends to loot or intentionally mismanage the corporation. *See Swinney v. Keebler Co.*, *supra*; *McDaniel v. Painter*, *supra*; *Brown v. Halbert*, 271 Cal.App.2d 252, 76 Cal.Rptr. 781 (1969).

it has been held, has no interest or expectancy in purchasing its own shares, *see Vulcanized Rubber & Plastic Co. v. Scheckter, supra,* and need not be afforded first opportunity to buy. Even were this Court to hold that, based upon the facts of this case, Treadway should have been afforded the opportunity to purchase the Cowin shares, it is clear that such a purchase would not have been in the best interests of the shareholders at that time.[26] In fact, the evidence indicated that, if anything, Treadway was interested at the time of the Cowin sale in selling, rather than purchasing, its own shares.[27]

■ A director is under no duty to "follow management blindly" and may even take steps which serve to promote a takeover without being *per se* in violation of his fiduciary duties. *Wellman v. Dickinson,* 475 F.Supp. at 835. *See also Campbell v. Loew's, Inc.,* 36 Del.Ch. 563, 134 A.2d 852 (1957). Cowin had the right to sell his shares, did not expropriate or misuse any confidential information in entering into such sale, and did not deprive Treadway of some corporate opportunity by doing so. There has been no showing that as a result of Cowin's having entered into discussions with Care, or having consummated the sale, the shareholders of Treadway have in any way been damaged.[28] While this Court finds that Cowin's behavior in failing to advise Treadway management of his continuing contracts with Care, and in seeking and accepting renomination to the Treadway board while negotiating the sale of his stock, constituted a betrayal of the trust placed in him by incumbent management, he did not breach any fiduciary duty owed to the shareholders or to the corporation.

■ In its claims against Care, the plaintiff asserts that Browne and deJourno were offered places on the Treadway board only as the result of affirmative misrepresentations made by Care. This claim is not plausible. Following the consummation of the Cowin sale, Care's ownership interest in Treadway approximated 26%, making it by far the largest single shareholder of the corporation. Ownership of such a large amount inherently carried with it the possibility that Care would seek to acquire control, and should have alerted the incumbent management of Treadway to the possibility of a takeover attempt. Even if they were not alerted, however, the Court finds that the statements made by Care prior to December 20, 1978, as to its purpose in acquiring the stock, were not material to (and did not induce) the decision of management of Treadway to offer a position on its board to deJourno. And it is clear that at least by February 14, 1979, the time of filing of Care's fourth amended Schedule 13D (stating that Care might decide to seek control), which was before Browne was asked to become Care's second representative on the Treadway board, Treadway's management was placed on specific notice as to the possibility of a takeover attempt.

■ Treadway contends that since Care engaged in open market purchases of Treadway stock and planned a takeover of the corporation while Browne and deJourno were members of the Treadway board,

---

**26.** Additional factors compelling the conclusion that a purchase by Treadway of the Cowin shares would not have been in the best interests of Treadway or its shareholders at that time are that: Treadway had an enormous working capital deficit at the time of the Care-Cowin sale; the purchase of the Cowin stock would have diverted funds needed for capital and operating purposes and; the present stated desire to purchase the Cowin shares is motivated by incumbent management's desire to enhance its prospects for retaining control of Treadway.

**27.** Even under the standard applicable when there is a sale of shares by a majority or con-

trolling shareholder, there was no breach of fiduciary duty, since there is no evidence that Cowin knew or should have known—or that there was any likelihood—that Care would loot or intentionally mismanage Treadway if it gained control.

**28.** This finding is supported by the fact that, even if Cowin had some duty to inform Treadway of his intent to sell and had given it the opportunity to purchase his stock, Treadway should not have (and on the facts then known probably would not have) made such a purchase.

those individual defendants acted in derogation of their fiduciary duties and are hereby liable to the corporation. The Court does not agree. A director is not by virtue of his position precluded from purchasing shares in that corporation, and in making such purchases is not *per se* acting in a fiduciary capacity. *See, e. g., Chatz v. Midco Oil Corp.*, 152 F.2d 153 (7th Cir. 1945); *Solimine v. Hollander*, 128 N.J.Eq. 228, 16 A.2d 203 (Ch.1940); *Keely v. Black, supra.* Thus it has been held that "in and of itself, there can be nothing improper so far as the corporate entity is concerned with one of its fiduciaries, be he officer, director or otherwise, buying up a controlling number of shares." *Vulcanized Rubber & Plastics Co. v. Scheckter*, 162 A.2d at 404–05. All purchases made by Care were reported to Treadway and the public in the various timely filed amendments to its Schedule 13D.

■ Nor is there anything inherently improper in a director promoting a takeover of the corporation by another party. *See Campbell v. Loew's, Inc., supra.* As this Court has noted with regard to Cowin, a director need not follow management when he believes it is not acting in the best interests of the corporation, and need not reveal whatever plans he has to it. The securities law, it has been stated, does not exist for the benefit of protecting incumbent management from hostile takeover attempts, *Wellman v. Dickinson*, 475 F.Supp. at 835, and should not be allowed to be used for such a purpose in this action.

■ As directors of Treadway, Browne and deJourno were obligated to act in good faith towards, and for the best interests of, the corporation. *See Daloisio v. Peninsula Land Co., supra.* Both Browne and deJourno have so acted. No evidence was presented at trial to indicate that either director misused any confidential or proprietary information. Nor is there any reason to believe that their knowledge and support of Care's intent to acquire control of Tread-

way was in any way adverse to the best interests of the shareholders, as opposed to the incumbent management, of Treadway. Based upon the evidence presented at trial, the Court concludes that neither Treadway nor its shareholders suffered any damages as a result of either Browne or deJourno being a director.[29]

Care's current ownership of Treadway stock was not the result of any violation by Browne, deJourno, or Cowin of fiduciary duties owed by any of them towards the corporation or its shareholders. Accordingly, as there is no basis for ordering Care to dispose of its shares or for enjoining the voting of those shares, the complaint against them is hereby dismissed.

### Counterclaims

In its supplemental counterclaims, Care (along with deJourno) as asserted that, in entering into and finally consummating its latest transaction with Fair Lanes, incumbent management of Treadway has acted for an improper corporate purpose, to the exclusion and detriment of the shareholders of Treadway, and in doing so has wasted corporate assets. Conversely, Treadway claims that the sale to Fair Lanes was entered into in good faith for a legitimate corporate purpose and was proper in all respects.

■ As this Court noted in its opinion of November 27, 1979, *Treadway Companies Inc. v. Care Corp.*, 490 F.Supp. at 653, it is well established that management of a corporation has the duty to oppose a takeover attempt which it, in good faith, has determined to be detrimental to the best interests of the corporation or its shareholders. *See Heit v. Baird*, 567 F.2d 1157 (1st Cir. 1977); *McPhail v. L. S. Starrett Co.*, 257 F.2d 388, 396 (1st Cir. 1958); *Northwest Industries, Inc. v. B. F. Goodrich Co.*, 301 F.Supp. 706, 712 (N.D.Ill.1969). It is equally well established, however, that this power may not be used by management

---

**29.** The Court, of course, reaches no conclusions as to the potential liability of Care in a suit for damages brought by a buyer or seller of Tread- way stock alleging violations of section 13(d) of the Exchange Act.

as a means to protect itself from what it views as a hostile takeover bid. Officers and directors of a corporation owe a fiduciary duty to all shareholders, minority and majority, and may not use their powers to further their own interests to the detriment of any of the shareholders. *Berkowitz v. Power/Mate Corp.*, 135 N.J.Super. 36, 342 A.2d 566 (Ch.Div.1975); *Daloisio v. Peninsula Land Co., supra; Schwartz v. Marien*, 37 N.Y.2d 487, 335 N.E.2d 334, 373 N.Y.S.2d 122 (1975).

Within the legitimate power of the board of directors is the authority, so long as used for a proper purpose, to sell treasury stock and to issue and sell authorized but unissued common stock. N.J.Stat.Ann. § 14A:7–4(1). In this regard, it has been held that the issuance and sale of stock for a valid purpose which has the incidental effect of enhancing the power and control of incumbent management does not, *per se*, constitute a misuse of that authority. *See Heit v. Baird*, 567 F.2d at 1161; *Klaus v. Hi-Shear Corp.*, 528 F.2d 225 (9th Cir. 1975). Management may not, however, by pretending to oppose an allegedly unfavorable takeover attempt, utilize this power to manipulate the issuance and sale of stock for the sole or primary purpose of perpetuating its control over the corporation. *See Chicago Stadium Corp. v. Scallen*, 530 F.2d 204 (8th Cir. 1976); *Podesta v. Calumet Industries, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 96,433 (N.D.Ill.1978); *Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769 (1967); *Elliott v. Baker*, 194 Mass. 518, 80 N.E. 450 (1907); *Hilles v. Parrish*, 14 N.J.Eq. 380 (1862); *Luther v. C. J. Luther Co.*, 118 Wis. 112, 94 N.W. 69 (1903).[30]

In determining whether incumbent management of Treadway has breached its duty owed the corporation or its shareholders by improperly manipulating the is-

suance and sale of shares, the Court must examine both the manner in which the sale agreement was entered into and negotiated and the ostensible justification for the sale itself. Treadway asserts that the discussions with Fair Lanes were initiated only after a careful examination of the various options available and notes that the sale of 230,000 shares has served several legitimate purposes, including enabling business combination negotiations to proceed and providing funds so that certain corporate debts could be retired. It also claims that the sale, which served to dilute the percentage ownership interest of Care, was necessary, in view of New Jersey's super-majority requirement, in order to effectuate a merger,[31] and was needed to avert an undesirable takeover. *See Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). In addition, it states that under the business judgment rule the terms of the transaction, absent fraud, self-dealing, or unconscionable conduct, are not subject to judicial scrutiny. *See Papalexiou v. Tower West Condominium*, 167 N.J.Super. 516, 401 A.2d 280 (Ch.Div.1979); *Exadaktilos v. Cinnaminson Realty Co., Inc.*, 167 N.J.Super. 141, 400 A.2d 554 (Ch.Div.1979). *But see Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980).

It is clear that, were the Court to find that the sale of the 230,000 shares was entered into in order to further a valid corporate purpose, the fact that the sale also prevented a Care takeover would not vitiate the validity of the transaction. The facts of this action, however, do not support such a conclusion. After examining the circumstances under which the transaction with Fair Lanes arose, the manner in which it was negotiated and then proposed to the board (in its various forms), and the way in

---

30. *See also Canada Southern Oils, Ltd. v. Manabi Exploration Co., Inc.*, 33 Del.Ch. 537, 96 A.2d 810 (1953); *Kullgren v. Navy Gas & Supply Co.*, 110 Colo. 454, 135 P.2d 1007 (1943); *Yasik v. Wachtel*, 25 Del.Ch. 247, 17 A.2d 309 (Ch.Div.1941); *L. E. Fosgate Co. v. Boston Market Terminal Co.*, 275 Mass. 99, 175 N.E. 86 (1930); *Dunlay v. Avenue M Garage & Repair Co., Ltd.*, 253 N.Y. 274, 170 N.E. 917 (1930); *Trask v. Chase*, 107 Me. 137, 77 A. 698 (1910).

31. Absent the issuance and sale of the 230,000 shares to Fair Lanes, Care's ownership interest in Treadway is now sufficiently large to prevent any merger or business combination it does not favor.

which it was finally consummated, the Court concludes that the primary purpose for Treadway in entering into the sale was to thwart a Care takeover. Thus, though aware that even an agreement entered into at the "eleventh hour" could, under the proper circumstances, be permissible, see *Heit v. Baird, supra; Klaus v. Hi-Shear Corp., supra,* the Court is bothered by the haste (to the exclusion of potentially more lucrative offers) with which this sale and the earlier proposed transactions were negotiated.[32] *See, e. g., Elliott v. Baker,* 80 N.E. at 452, ("such haste does not commonly characterize square business dealings"). And while it is not the province of the judiciary to analyze the actual terms of the deal entered into, the Court notes that in negotiating this deal incumbent management of Treadway was willing to agree to whatever terms were necessary, however detrimental to the interests of the corporation or its shareholders, in order to quickly consummate the sale and thereby retain control of the corporation at the next annual shareholders meeting.[33] Moreover, Treadway has consistently structured its proposed transactions so as to avoid shareholder scrutiny, and, in fact, withdrew from consideration its first attempt at negotiating a deal specifically to avoid such a vote.

It is also apparent from the evidence adduced at trial that no good faith effort was ever made by incumbent management of Treadway to determine whether a takeover by Care would or would not be in the best interests of the corporation or its shareholders.[34] From the first moment Lieblich knew that such a takeover was possible, and thus that a challenge to his control was looming, he determined to oppose it at all costs. Thereafter, Swordco was directed to operate upon the premise that Care control would be detrimental to the corporation, and that therefore it should develop alternatives to such an eventuality. The determination of the board of directors that a Care takeover would not be in the best interests of the corporation was reached for the purpose of perpetuating its own control, and not with the best interests of the corporation in mind. As a result, the manipulation of shares involved in the Fair Lanes sale, unlike the situation involved in *Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra,* was done for an impermissible purpose.

Finally, the Court remains extremely troubled in the present situation, as it was at earlier stages, by Treadway's stated purpose of issuing and selling the shares so as to dilute Care's "blocking position" with regard to any potential merger or business combination. This "blocking position" was afforded to minority shareholders under New Jersey law for the purpose of protecting those who controlled at least a one-third interest in a corporation from being forced to acquiesce in a merger of which they did not approve.[35] As this Court previously noted, it would be highly inappropriate to allow this statutory provision, specifically intended to prevent unfair combination by the controlling interests, to be so easily circumvented by the simple act of management issuing and selling shares, without any form of shareholder approval, for the stated purpose of diluting the minority interest. Yet, if allowed to proceed, Treadway's actions would have precisely that effect.

32. The initial talks with Fair Lanes did not actually commence until after this Court's decision of October 12, 1979, denying Treadway's *motion for a preliminary injunction.*

33. Thus Treadway agreed to terms which, on their face, seem to be less than advantageous to the corporation and its shareholders, including the agreement to afford Fair Lanes exclusive merger negotiations for a certain period of time (despite there being other parties interested in a possible merger) and the agreement to negotiate the business combination on the basis of a share-for-share exchange, despite the exclusion of substantial assets by Fair Lanes.

34. We do not, of course, express any opinion on the merits or demerits of a Care takeover from the standpoint of the stockholders.

35. This requirement of two-thirds shareholder approval for any merger or business combination applies only to corporations organized prior to 1973. N.J.Stat.Ann. § 14A:10–3.

The attempt to circumvent the statutory "blocking position" afforded to minority shareholders is, in many ways, the most objectionable aspect of the instant transaction. Yet, to enjoin only the voting of the shares on the eventual vote for the proposed merger would be inadequate. Were only such limited relief ordered, Fair Lanes would be left in the position where it could first vote its shares at the annual meeting, and thereby play a crucial role in the election of directors, and then, under the terms of the sale agreement, rescind the sale and tender the shares back to Treadway. And, in fact, the potentially pivotal role of the Fair Lanes stock was made clear by the vote for the election of directors which took place on March 20, 1980, after the trial on this action, and as to which, pursuant to an order of this Court dated March 18, 1980, the vote of the Fair Lanes stock was segregated and counted separately. The results of that vote have now demonstrated that it is the vote of these shares which provided the margin of victory for incumbent management and thus, if allowed to stand, would prove determinative as to the proxy vote.[36] Such a result cannot be permitted.

In negotiating and entering into the sale of 230,000 shares of common stock to Fair Lanes, Treadway's incumbent management was primarily motivated by its desire to stave off a Care takeover bid. The evidence produced at trial further indicated that, whatever the alleged business justifications for the sale, these other justifications were at best secondary interests of management and were, to a substantial extent, nothing more than after-the-fact justifications for the sale. As was noted in *In re Seminole Oil & Gas Corp.*, 38 Del.Ch. 246, 150 A.2d 20, 24 (1959), "[i]t is a mockery, in the face of this record to suggest that the 'control' effect of this agreement was merely incidental to its primary business objective." As the primary purpose of the sale of stock to Fair Lanes was to influence the proxy contest, perpetuate incumbent management's control over Treadway, thwart Care's takeover bid, and dilute Care's statutory blocking position so as to influence the subsequent shareholders vote on a proposed business combination, the Court finds that the issuance and sale of stock was improperly motivated, entered into for no legitimate business purpose, and constitutes a violation by the director defendants of their fiduciary duty.[37]

As it is the voting, and not the sale, of the shares which the Court has found to be impermissible, there is no need to order that the sale be rescinded and the shares be cancelled. It is accordingly ordered that the voting of the 230,000 shares of stock sold pursuant to the instant transaction be permanently enjoined. To the extent that such shares were voted, pursuant to this Court's order of March 18, 1980, at the annual shareholders meeting, those votes shall not be counted.

### Conclusions

The Court, after a trial on the merits, hereby finds that, having failed to establish

---

**36.** In its order of March 18, the Court also directed that the votes of the former Cowin shares be segregated and counted separately. The actual tabulation of votes gave the Lieblich slate of directors approximately 722,000 votes and the Care slate including the Cowin shares) approximately 617,000 votes. Thus the 230,-000 shares voted by Fair Lanes provide the margin for the victory of the Lieblich slate.

**37.** Having found that the individual counterclaim defendants have, in consummating the Fair Lanes transaction, breached their fiduciary duty to the corporation and its shareholders, the Court sees no need to reach the issues presented in Care's claims under Rule 10b-5, and section 720 of the New York's Business Corporation Law. Nevertheless, to the extent that these claims have been considered, the Court expresses doubt as to whether Care has adequately proven the requisite element of causation to make out a claim under Rule 10b–5, see, e. g., *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Altman v. Knight*, 431 F.Supp. 309 (S.D.N.Y. 1977), or whether section 720 provides any basis for relief other than that provided under the New Jersey fiduciary duty standard. Of course, in reaching its determination as to the applicable New Jersey standards, the Court has had to look to the law of other jurisdictions since no New Jersey case has been cited, or found, which deals completely with all of the issues presented by the counterclaims.

any breach of fiduciary duty by Cowin, Browne, deJourno, or Care (derivatively), Treadway's complaint must be dismissed in its entirety. The Court additionally finds as to the counterclaim of Care and deJourno alleging breach of fiduciary duty against the individual director defendants that, in entering into and consummating the latest sale agreement with Fair Lanes, those directors have breached their duty of care owed to the corporation and its shareholders. Accordingly, the voting of those 230,000 shares is permanently enjoined.

The parties are directed to settle an order and judgment upon notice.

SO ORDERED.